761 S.E.2d 241

**BOARD OF TRUSTEES FOR the FAIRFIELD COUNTY SCHOOL DISTRICT, Appellant,**

v.

**STATE of South Carolina, Chester County School District, Fairfield County Treasurer, and State Department of Education, Respondents.**

**Appellate Case No. 2012–212697.**

**No. 27417.**

Supreme Court of South Carolina.

Heard Nov. 7, 2013.
Decided July 16, 2014.

120

Armand G. Derfner, of Derfner Altman & Wilborn, LLC, of Charleston, Alice F. Paylor and Rene Stuhr Dukes, both of Rosen Rosen & Hagood, LLC, of Charleston, for Appellant.

James S. Meggs, of Callison Tighe & Robinson, LLC, of Columbia, John Marshall Reagle, Allison Aiken Hanna and Kimberly Kelley Blackburn, all of Childs & Halligan, PA, of Columbia, Attorney General Alan Wilson, Assistant Deputy Attorney General J. Emory Smith, Jr., Wendy Bergfeldt Cartledge and Shelly Bezanson Kelly, all of Columbia, for Respondents.

Justice PLEICONES.

In this direct appeal, the Board of Trustees for the Fairfield County School District (FCSD) appeal the circuit court's grant of summary judgment in favor of the State of South Carolina, Chester County School District (CCSD), the Fairfield County Treasurer, and the State Department of Education (collectively Respondents). We affirm.

## FACTS

For the past four decades between 100 and 200 children residing in the Mitford Community of Fairfield County have been attending CCSD schools in the Great Falls area of Chester County. The CCSD schools are closer to the Mitford Community than are any FCSD schools. The Mitford students have been attending CCSD schools at no cost to the students or their families.

Mitford students' attendance at CCSD schools began as a result of a Federal 1970 desegregation order, which required the all African–American Mitford Elementary School be closed, and its students be given the choice of attending CCSD's Great Falls schools. In 1972, the General Assembly passed Act No. 1236, consolidating the Mitford Community into CCSD. This Act was repealed the following year based on an agreement between FCSD and CCSD respecting the Mitford Community's students' enrollment in CCSD's schools. Under this agreement, FCSD paid CCSD $25,000 per year for educational expenses.

In 2007, this long standing agreement began to break down and finally ended in the 2009–10 school year when no agreement was reached for that year or thereafter. In light of the school districts' failure to reach an agreement for payment to CCSD for the cost of educating Mitford Community's students in CCSD's schools and FCSD's refusal to continue negotiations, the General Assembly passed Act No. 294 of 2010 (Act No. 294)[1] in order to provide for a uniform arrangement between FCSD and CCSD.

---

1. Act No. 294 is now codified as S.C.Code Ann. § 59–63–485 (Supp. 2013) and provides:

   (A) The General Assembly finds that numerous public school students reside in Fairfield County School District but are entitled to attend the schools of Chester County School District pursuant to Section 59–63–480. The General Assembly finds it necessary to provide by law for uniform arrangements between Fairfield County School District and Chester County School District pertaining to these students. (B) A student who qualifies for transfer pursuant to Section 59–63–480 may be admitted, and remain enrolled, by Chester County School District upon proof of eligibility as Chester County School District finds acceptable. A roster of these students must be kept current by Chester County School District and sent to Fairfield County School District as and when updated.

Pursuant to section 59–63–485(C), CCSD has invoiced the Fairfield County Treasurer $1,838,703 for the expenses of educating the Mitford children for the past three school years.

FCSD filed suit against the Respondents seeking a declaratory judgment that Act No. 294 was unconstitutional. FCSD

(1) Each fiscal year, for each pupil authorized to transfer from Fairfield County School District to Chester County School District pursuant to Section 59–63–480 and actually enrolled in a public school of Chester County School District, the Fairfield County Treasurer, on behalf of and from funds of the Fairfield County School District, shall pay Chester County School District one hundred and three percent of Chester County School District's prior year local revenue per pupil for school operating purposes as reported in Chester County School District's annual audit for the immediately preceding fiscal year.

(2) As used in this section, "prior year local revenue per pupil for school operating purposes" includes any state reimbursement paid for property tax exemptions from Chester County School District ad valorem taxes including, but not limited to, all payments pursuant to Section 11–11–156.

(C) Upon invoice, the Fairfield County Treasurer, on behalf of and from the funds of the Fairfield County School District, shall pay Chester County School District the amount determined pursuant to subsection (B)(1) of this section. Payment to Chester County School District must be completed before the fifteenth day of February in each fiscal year. If the Fairfield County Treasurer fails to pay this invoice by the fifteenth day of February, the South Carolina Department of Education, upon application by Chester County School District, out of the funds otherwise meant for the next Education Finance Act disbursement to Fairfield County School District, shall pay the invoice on behalf of Fairfield County School District. Any undisputed amounts must be paid when due.

(D) Chester County School District may consider payments pursuant to this act to be anticipated ad valorem taxation for purposes of Subsection 7, Section 15, Article X of the South Carolina Constitution, relating to tax anticipation notes.

(E) The State Superintendent of Education shall settle any dispute between Chester County School District and Fairfield County School District arising from the implementation and administration of this act by the school districts and the State Department of Education.

(F) For the 2009–2010 school and the fiscal year only, the Fairfield County Treasurer, on behalf of and from the funds of the Fairfield County School District, shall pay the Chester County School District an amount calculated pursuant to items (B)(1) and (2) of this section on account of the pupils enrolled in the Chester County School District from Fairfield County pursuant to Section 59–63–480 for the 2009–2010 school year. This amount must be invoiced by the Chester County School District promptly upon the effective date of this

contended that Act No. 294 was unconstitutional special legislation in violation of S.C. Const. art. III, § 34(IX), "because it directly conflicts with and undermines South Carolina's general law governing residence requirements for school attendance and general law governing the financing of schools." CCSD, the State, and FCSD filed cross motions for summary judgment as to the constitutionality of Act No. 294. The circuit court issued an order denying FCSD's motion and granting CCSD and the State's motions for summary judgment, holding that Act No. 294 was constitutional special legislation, and FCSD appealed.

## Standard of Review

■ "In reviewing the grant of summary judgment, [an appellate court] applies the same standard that governs the trial court under Rule 56, SCRCP: summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Pittman v. Grand Strand Entm't, Inc.*, 363 S.C. 531, 536, 611 S.E.2d 922, 925 (2005).

## Discussion

■ The only issue before this Court is whether the circuit court erred in granting summary judgment because FCSD failed to carry its burden of production. The parties agree that Act No. 294 is special legislation because the more general law found in S.C.Code Ann. § 59–63–480 (2004)[2] applies to the transfer of students between school districts based upon geographic proximity. In addition, FCSD con-

---

section, and must be paid no later than June 30, 2010, or the delinquency provisions of subsection (C) apply to the payment.

2. Section 59–63–480 provides:

If school children in one county reside closer to schools in an adjacent county, they may attend such schools upon the school authorities of the county of their residence arranging with the school officials of the adjacent county for such admission and upon payment of appropriate charges as herein authorized. The board of trustees in the school district in which the pupils reside shall make written application through its county board of education to the board of trustees of the district in which the school is located for the admission of such children, giving full information as to ages, residence and school attainment, and the board of trustees in the school district, agreeing to accept such pupils, shall give a written statement of agreement. Upon receipt of such application the board of trustees

tends that Act No. 294 violates Article III, § 34(IX) because the General Assembly has failed to set forth any logical basis or sound reason for Act No. 294's enactment. We agree with the circuit court that FCSD failed to present any evidence that the General Assembly had neither a logical basis nor sound reason for enacting Act No. 294 and therefore affirm the circuit court order granting summary judgment.

Article III, § 34(IX), states in pertinent part: "where a general law can be made applicable, no special law shall be enacted." Despite this language, it is well settled that Article III, § 34(IX) does not prohibit all special legislation, as this Court recently explained:

A law is general when it applies uniformly to all persons or things within a proper class, and special when it applies to only one or more individuals or things belonging to that same class. If the legislation does not apply uniformly, the inquiry then becomes whether the legislation creates an unlawful classification. However, the mere fact that a law creates a classification does not render it unlawful. Instead, the constitutional prohibition against special legislation operates similarly to our equal protection guarantee in that it prohibits unreasonable and arbitrary classifications. A classification is arbitrary, and therefore unconstitutional, if there is no reasonable hypothesis to support it. Accordingly, special legislation is not unconstitutional where there is a substantial distinction having reference to the subject matter of the proposed legislation, between the objects or places embraced in such legislation and the objects and places excluded. *Charleston County. Sch. Dist. v. Harrell*, 393 S.C. 552, 558, 713 S.E.2d 604, 608 (2011) (citations and quotations omitted).

Thus, where a special law will best meet the exigencies[3] of a

---

of the school and its county board of education shall determine the monthly per pupil cost of all overhead expenses of the school, which will include all expenses of the school not paid by the State. Upon proper arrangement being made for the payment monthly of such overhead per pupil cost for each such child the same shall be admitted to the schools of the adjacent county.

3. We note that exigency as used in this sense means "that which is required in a particular situation." Merriam–Webster Dictionary, http://www.merriam-webster.com/dictionary/exigency.

particular situation, it is not unconstitutional. *Id.* at 558, 713 S.E.2d at 608 (citing *Med. Soc'y of S.C. v. Med. Univ. of S.C.*, 334 S.C. 270, 279, 513 S.E.2d 352, 357 (1999)). Restated, special legislation will survive a constitutional challenge where there is a logical basis and sound reason for resorting to such legislation. *Id.* (citing *Horry County v. Horry County Higher Educ. Comm'n,* 306 S.C. 416, 419, 412 S.E.2d 421, 423 (1991)). Additionally, while not exempt from the requirements of Article III, § 34(IX), this Court has recognized that the General Assembly has broad authority when enacting legislation that deals with education. *Horry County,* at 419, 412 S.E.2d at 423.

The circuit court found that FCSD presented no evidence tending to show that the General Assembly's enactment of Act. No. 294 violated the proscription of Article III, 34(IX). We agree.

FCSD's sole argument below and on appeal is that there is neither a logical basis nor a sound reason for this legislation because the transfer of these students could be provided for by existing general law. This argument, however, merely establishes that Act No. 294 is special legislation and is not probative of the second element that a challenger must establish, that is, whether the General Assembly failed to have a logical basis or sound reason for enacting Act No. 294. Therefore, the circuit court was correct in holding that FCSD had failed to present any evidence as to why there was neither a logical basis nor sound reason for enacting Act No. 294.

█ It is well settled that the non-moving party may not rely on mere allegations to resist summary judgment but must present some evidence in the form of affidavits or otherwise in support of its proposition. *Woodson v. DLI Props., LLC,* 406 S.C. 517, 753 S.E.2d 428 (2014). Because FCSD has failed to present any evidence beyond mere allegations that there is neither a logical basis nor sound reason for the enactment of Act No. 294, we must affirm the grant of summary judgment by the circuit court.[4]

**AFFIRMED.**

---

4. The dissent criticizes this holding because we "myopically focus on the procedural posture of the case" leading to "truncated analysis" that

TOAL, C.J. and KITTREDGE, J., concur.

BEATTY, J., dissenting in a separate opinion in which HEARN, J., concurs.

Justice BEATTY.

I respectfully dissent. The majority agrees that Act No. 294 is special legislation; however, it affirms the grant of summary judgment because "FCSD failed to present any evidence that the General Assembly had neither a logical basis nor sound reason for enacting Act No. 294." In reaching this conclusion, the majority myopically focuses on the procedural posture of the instant case and, in turn, effectively discounts the fundamental question regarding the constitutionality of Act No. 294. In my view, the majority's truncated analysis fails to fully address the constitutional propriety of Act No. 294. If one engages in a comprehensive analysis, I believe the result is clear that Act No. 294 is unconstitutional special legislation.

## I. Discussion

### A. General/Special Legislation

Our state constitution prohibits the enactment of certain special or local laws as it provides, "The General Assembly of

"fails to fully address the constitutional propriety of Act No. 294." First, we readily acknowledge that we endeavor to decide an appeal as the parties have procedurally presented it. We exceed our proper role when we do not honor these boundaries. As to our "truncated analysis," FCSD failed to present any evidence that the termination of this historical arrangement was neither a logical basis nor a sound reason for enacting this special legislation. *Woodson, supra.* Our analysis must necessarily end here.

The dissent however, applies a more "comprehensive analysis." While the dissent acknowledges this Court's deference to the General Assembly and the burden on FCSD, it then requires a "quantitative or statistical comparison to other school districts" to support the enactment of Act. No. 294. We have never required quantitative or statistical justification of legislation even in the context of special legislation. Assuming this case did turn on such a comparison, FCSD, as the party challenging the legislation, is the party required to present such a quantitative or statistical comparison to other school districts so as to demonstrate the absence of an exigent circumstance. While the dissent applies a "comprehensive analysis," it fails to explain why it requires more from the General Assembly than it requires from the party challenging the legislation.

this State shall not enact local or special laws ... where a general law can be made applicable." S.C. Const. art. III, § 34, c. IX. "The purpose of the prohibition on special legislation is to make uniform where possible the statutory laws of this State in order to avoid duplicative or conflicting laws on the same subject." *Med. Soc'y of S.C. v. Med. Univ. of S.C.,* 334 S.C. 270, 279, 513 S.E.2d 352, 357 (1999). "The allowance of special legislation, where a general law could be made applicable, fosters 'legislation by delegation,' which is pernicious." *Duke Power Co. v. S.C. Pub. Serv. Comm'n,* 284 S.C. 81, 90, 326 S.E.2d 395, 400 (1985) (citations omitted). "Such legislation lacks the settled consideration and consent of the lawmaking body, evades statewide responsibility, encourages local activity, [and] discourages the attrition of minds and the consideration of those problems which make for a wise public policy." *Id.*

The General Assembly may, however, enact "special provisions in general laws." S.C. Const. art. III, § 34, c. X. "[A] general law is defined as follows: 'In order that a law may be general, it must be of force in every county in the state, and while it may contain special provisions making its effect different in certain counties, those counties cannot be exempt from its entire operation.'" *City of Columbia v. Smith,* 105 S.C. 348, 361–62, 89 S.E. 1028, 1032 (1916) (quoting *Dean v. Spartanburg Cnty.,* 59 S.C. 110, 114, 37 S.E. 226, 228 (1900)). Stated another way, "special provisions in general laws" means that "provisions in general laws, which, while having a limited application, must not be so inconsistent with the general scheme or purpose of the statute as to prevent substantial uniformity of operation throughout the state." *Gamble v. Clarendon Cnty.,* 188 S.C. 250, 257, 198 S.E. 857, 861 (1938).

Legislation regarding education is not exempt from the constitutional prohibition of special laws, "even though art. XI, § 3, gives the General Assembly more discretion with respect to legislation impacting a school district than it has in other areas." *Home Builders Ass'n of S.C. v. Sch. Dist. No. 2 of Dorchester Cnty.,* 405 S.C. 458, 460, 748 S.E.2d 230, 232 (2013). Moreover, "[i]t is firmly settled in this state that while it is primarily for the Legislature to decide whether a general law can be made applicable in any specific case, the question is

ultimately a judicial one, in solving which the Courts will give due consideration to the opinion of the Legislature." *Sansing v. Cherokee Cnty. Tourist Camp Bd.,* 195 S.C. 7, 10, 10 S.E.2d 157, 158 (1940).

In answering this question, our appellate courts have continued to adhere to the well-established analytical framework for assessing whether legislation constitutes prohibitive special legislation. *See Charleston Cnty. Sch. Dist. v. Harrell,* 393 S.C. 552, 713 S.E.2d 604 (2011) (reaffirming test to determine whether special legislation exists as outlined in *Kizer v. Clark,* 360 S.C. 86, 600 S.E.2d 529 (2004)). In *Harrell,* this Court stated:

> "A law is general when it applies uniformly to all persons or things within a proper class, and special when it applies to only one or more individuals or things belonging to that same class." If the legislation does not apply uniformly, the inquiry then becomes whether the legislation creates an unlawful classification. However, the mere fact that a law creates a classification does not render it unlawful. Instead, the constitutional prohibition against special legislation operates similarly to our equal protection guarantee in that it prohibits unreasonable and arbitrary classifications. "A classification is arbitrary, and therefore unconstitutional, if there is no reasonable hypothesis to support it." Accordingly, special legislation is not unconstitutional where there is "a substantial distinction having reference to the subject matter of the proposed legislation, between the objects or places embraced in such legislation and the objects and places excluded."

*Id.* at 558, 713 S.E.2d at 608 (citations omitted). "Thus, where a special law will best meet the exigencies of a particular situation, it is not unconstitutional." *Id.* at 558, 713 S.E.2d at 608 (citing *Med. Soc'y of S.C. v. Med. Univ. of S.C.,* 334 S.C. 270, 279, 513 S.E.2d 352, 357 (1999)). " 'In other words, the General Assembly must have a logical basis and sound reason for resorting to special legislation.' " *Id.* at 559, 713 S.E.2d at 608 (quoting *Horry Cnty. v. Horry Cnty. Higher Educ. Comm'n,* 306 S.C. 416, 419, 412 S.E.2d 421, 423 (1991)).

**B. Analysis of Act No. 294**

The parties concede that Act No. 294 is special legislation as it applies only to FCSD and CCSD. This concession, however, is not dispositive as one must still analyze the constitutional propriety of Act No. 294. In doing so, it is necessary to first assess whether Act No. 294 conflicts with general law governing the transfer of students to a non-resident school district. In conjunction with this assessment, one must also consider whether Act No. 294 may be deemed a special provision within the general law. If Act No. 294 conflicts with the general law, the question becomes whether the General Assembly espoused a logical basis and sound reason for enacting this special legislation. As will be discussed, I would hold that Act No. 294 is unconstitutional special legislation as it is in direct conflict with existing general law governing the transfer of students to non-resident school districts and there is no evidence that the General Assembly had a logical basis and sound reason for resorting to this special legislation.

### *(1) General Laws Governing Public Education*

The South Carolina Constitution imposes on the General Assembly the duty to "provide for the maintenance and support of a system of free public schools open to all children in the State." S.C. Const. art. XI, § 3. In fulfilling this duty, the General Assembly has enacted a scheme of general laws governing public education throughout our state. Pursuant to these general laws, all South Carolina children who meet the requisite qualifications are entitled to a free public education. *See* S.C.Code Ann. § 59–63–30 (2004) (outlining qualifications for child's attendance in a public school district without charge); S.C.Code Ann. § 59–63–31 (2004 & Supp.2012) (identifying additional qualifications for child's attendance in a public school district without charge involving situations such as a court-ordered custody arrangement or foster care placement). In order to achieve this goal, the General Assembly created a method of financing school districts through the use of federal, state, and local funds. *See, e.g.,* S.C.Code Ann. §§ 59–20–10 to –80 (2004 & Supp.2012) (provisions of the South Carolina Education Finance Act of 1977); *id.* §§ 59–21–10 to –1220 (providing for state aid for schools); *id.* §§ 59–73–10 to –160 (authorizing county taxation for school purposes).

Cognizant that a child's educational needs may be better met by a school in a non-resident district, the General Assembly has enacted general laws authorizing children to transfer to an adjacent school district if it is closer in proximity to the child's home or to an adjoining school district if a particular school would better accommodate the student. *See* S.C.Code Ann. § 59–63–480 (2004) (permitting school children, who reside in county closer to schools to adjacent county, to attend schools in adjacent county upon application by the transferring board of trustees to the board of trustees in the receiving district); *id.* § 59–63–490 (providing that when a child would be "better accommodated at the school of an adjoining school district, whether special or otherwise, the board of trustees of the school district in which such person resides may, with the consent of the board of trustees of the school district in which such school is located, transfer such person for education to the school district in which such school is located, and the trustees of the school district in which the school is located shall receive such person into the school as though he resided within the district").

In each of these situations, the boards of trustees for the transferring and receiving districts are actively involved and statutorily authorized to exercise discretion in the transfer process. *See* S.C.Code Ann. § 59–19–10 (2004) ("Each school district shall be under the management and control of the board of trustees provided for in this article, subject to the supervision and orders of the county board of education."); *id.* § 59–19–90(9), (10)(b) (authorizing board of trustees to transfer and assign pupils as well as prescribe conditions and charges for attendance in public schools of the school district). The General Assembly has recognized the significance of this authority as any infringement constitutes a criminal offense. *See* S.C.Code Ann. § 59–63–500 (2004) ("The trustees of any school district who knowingly permit the enrollment of pupils *who have not been transferred with the consent of the trustees of the district wherein such pupils reside* shall be guilty of a misdemeanor and, upon conviction, shall pay a fine not exceeding twenty-five dollars or be imprisoned not more than thirty days." (emphasis added)).

Because a receiving school district incurs expenses for educating a nonresident student, the General Assembly has enacted general laws to compensate the district for these

expenses. Specifically, section 59–63–480 [5] provides for the determination of a monthly per pupil cost and section 59–63–45 [6] outlines a method for the calculation and payment of tuition to the non-resident district. S.C.Code Ann. §§ 59–63–45, 59–63–480 (2004).

As evident by its text, section 59–63–45 requires that: (1) the person responsible for educating the non-resident child, presumably his or her parent, to pay tuition to the receiving school district; (2) the amount of tuition, which may be waived in whole or in part by the receiving district, be calculated pursuant to an identified formula; and (3) the non-resident student be included in the enrollment of the school in which he or she is attending to determine the allocation of state funds to that district for funding public education. *Id.* § 59–63–45.

---

5. Section 59–63–480 provides:

*If school children in one county reside closer to schools in an adjacent county, they may attend such schools upon the school authorities of the county of their residence arranging with the school officials of the adjacent county for such admission and upon payment of appropriate charges as herein authorized.* The board of trustees in the school district in which the pupils reside shall make written application through its county board of education to the board of trustees of the district in which the school is located for the admission of such children, giving full information as to ages, residence and school attainment, and the board of trustees in the school district, agreeing to accept such pupils, shall give a written statement of agreement. Upon receipt of such application the board of trustees of the school and its county board of education shall determine the monthly per pupil cost of all overhead expenses of the school, which will include all expenses of the school not paid by the State. Upon proper arrangement being made for the payment monthly of such overhead per pupil cost for each such child the same shall be admitted to the schools of the adjacent county.

S.C.Code Ann. § 59–63–480 (2004) (emphasis added).

6. Section 59–63–45 provides in relevant part:

Notwithstanding the provisions of this chapter, a nonresident child otherwise meeting the enrollment requirements of this chapter may attend a school in a school district which he is *otherwise qualified to attend if the person responsible for educating the child pays an amount equal to the prior year's local revenue per child raised by the millage levied for school district operations and debt service reduced by school taxes on real property owned by the child paid to the school district in which he is enrolled.* The district may waive all or a portion of the payment required by this section.

S.C.Code Ann. § 59–63–45(A) (2004) (emphasis added).

### (2) Comparison of Act No. 294 with the General Laws

In comparison with these general laws, Act No. 294 provides a completely different method for the transfer of Fairfield County resident children to CCSD and the calculation and payment of tuition for these students. Act No. 294 also eliminates the statutorily granted authority of FCSD's Board of Trustees with respect to the transfer.

As codified in section 59–63–485, children in Fairfield County may transfer to CCSD without any involvement of their resident district. Unlike the general law of section 59–63–480, the Board of Trustees for Fairfield County no longer makes the written application for the child's transfer nor is involved in reaching an arrangement to compensate CCSD for the costs incurred in educating the nonresident child. S.C.Code Ann. § 59–63–485(B) (Supp.2012). Furthermore, in contrast to the procedures of section 59–63–45, FCSD rather than a child's parent is responsible for payment of tuition in an amount calculated by CCSD. *Id.* § 59–63–485(B)(1), (2). Notably, CCSD invoices this amount directly to the Fairfield County Treasurer rather than FCSD. *Id.* § 59–63–485(C). If the Fairfield County Treasurer fails to pay the amount invoiced by February 15 of each year, the South Carolina Department of Education is authorized to pay CCSD using funds otherwise meant for FCSD under the Education Finance Act. *Id.* In view of these significant distinctions, I find that Act No. 294 conflicts with existing general laws.

Moreover, Act No. 294 cannot be deemed a "special provision" in a general law as it impermissibly exempts FCSD and CCSD from the operation of the general law. Although Act No. 294 expressly incorporates section 59–63–480 regarding the transfer to an adjacent district, this reference does not save the legislation. *Id.* § 59–63–485(A), (B), (F). Because Act No. 294 is inconsistent with the scheme of the existing general laws, it prevents substantial uniformity of the operation of general laws throughout the state.

### (3) "Logical Basis and Sound Reason" for Act No. 294

Having found Act No. 294 conflicts with the general laws, the question becomes whether the General Assembly had a logical basis and sound reason for enacting the special legisla-

tion. I find there is no substantial distinction between FCSD and other school districts throughout the state to warrant the special legislation.

Although the Act states that the "General Assembly *finds* that numerous public school students reside in Fairfield County School District but are entitled to attend the schools of Chester County School District pursuant to Section 59–63–480" and that the "General Assembly *finds* it necessary to provide by law for uniform arrangements between Fairfield County School District and Chester County School District pertaining to these students," I do not believe the incorporation of "finds" is sufficient to escape the constitutional prohibition of special legislation. S.C.Code Ann. § 59–63–485(A) (Supp.2012) (emphasis added). Indeed, if this were the case, the mere inclusion of the word would serve as blanket protection for all special legislation. *See Thorne v. Seabrook,* 264 S.C. 503, 510, 216 S.E.2d 177, 180 (1975) (" 'If it must be assumed, merely because the statute has been enacted, that the Legislature had information showing that there was a necessity for such legislation with reference to the particular locality, it would follow that all legislation local in form must be upheld, however general the nature and subject-matter of such legislation might be. Such a rule of construction would be contrary to the mandatory character of the constitutional provisions we are considering.' " (*quoting Thomas v. Macklen,* 186 S.C. 290, 298, 195 S.E. 539, 542–43 (1938))).

Instead, the legislative history is devoid of any quantitative data or statistical comparison to other school districts to support the General Assembly's "finding" that the voluntary transfer of students from FCSD to CCSD constitutes a unique or exigent situation justifying the enactment of special legislation. *See Elliott v. Sligh,* 233 S.C. 161, 165, 103 S.E.2d 923, 926 (1958) ("The Legislature may classify, for the purpose of legislation, if some intrinsic reason exists why the law should operate upon some and not upon all, or should affect some differently from others, but this classification must be based upon differences which are either defined by the Constitution, or are natural or intrinsic, and which suggest a reason that may rationally be held to justify the diversity in the legislation." (citation omitted)); *Shillito v. City of Spartanburg,* 214 S.C. 11, 20, 51 S.E.2d 95, 98 (1948) ("The marks of distinction

upon which the classification is founded must be such, in the nature of things, as will in some reasonable degree, at least, account for or justify the restriction of the legislation.").

In the absence of supporting evidence, I conclude that neither the history nor the number of students choosing to transfer from FCSD to CCSD represents an "exigent situation" in need of special legislation. Until the enactment of Act No. 294, Fairfield County approved these transfers since 1947 and voluntarily reimbursed CCSD for the resultant expenses since 1973 even though it was never statutorily required to do so. Because Fairfield County has the resources and facilities to provide free public education for all of its resident children, I discern no reason why FCSD should now be statutorily required to reimburse CCSD for continued voluntary transfers as the general laws are sufficient to govern the transfer of Fairfield County resident children to CCSD.

The majority reaches the opposite conclusion because it essentially requires FCSD to affirmatively prove a negative proposition, i.e., the General Assembly had neither a logical basis nor sound reason for enacting Act No. 294.[7] The only way FCSD can satisfy this burden is to refute the reasons advanced by the General Assembly for enacting the special legislation. Thus, in order to establish the constitutional invalidity of Act No. 294, FCSD must attack the plain language of Act No. 294 and the legislative history. As discussed, FCSD has successfully shown that neither the historical agreement[8] between FCSD and CCSD nor the number of Mitford students choosing to attend school in CCSD represents a sound basis or reason for resorting to such special legislation. Consequently, I would hold that Act No. 294 is

---

7. Specifically, the majority notes that "FCSD, as the party challenging the legislation, is the party required to present such a quantitative or statistical comparison to other school districts so as to demonstrate the absence of an exigent circumstance." However, the majority fails to acknowledge that it is impossible to offer evidence of a fact that does not exist, i.e. the *absence* of an exigent circumstance.

8. The majority accepts the longstanding agreement between the districts as support for the special legislation on the ground it met the "exigencies" of the particular situation. I cannot do so as the impetus for this agreement was to address desegregation in 1970, which was no longer a concern when the General Assembly enacted Act No. 294 in 2010.

unconstitutional special legislation because its repugnance to section 34 of Article III is clear beyond a reasonable doubt. *See Thomas v. Macklen,* 186 S.C. 290, 301, 195 S.E. 539, 543–44 (1938) ("A mere classification for the purpose of legislation, without regard to such necessity, is simply special legislation of the most pernicious character, and is condemned by the constitution." (citation omitted)).

## II. Conclusion

I recognize that due deference is given to the General Assembly to address the individualized education needs of each school district; however, this deference is not limitless. The instant case presents such a scenario as Act No. 294 goes beyond the funding needs of a particular school district. Act No. 294 conflicts with general law regarding every aspect of the transfer process despite the lack of evidence that FCSD differs from any other district of South Carolina.

Although I am not unsympathetic to the plight of Mitford students who choose to attend school in CCSD, there are general laws in place to allow their continued attendance in CCSD. Moreover, if CCSD is genuinely concerned with their continued attendance, it may: (1) waive all or part of the tuition pursuant to section 59–63–45, or (2) petition the county board of education to adjudicate and effectuate the transfer of Mitford students to CCSD. *See* S.C.Code Ann. § 59–63–510 (2004) ("When a transfer of pupils from one district to another is sought and the trustees of the latter district unreasonably or capriciously withhold their consent, the county board of education of the county in which the districts are located shall have the right, after hearing, to make the transfer, but only on condition that each pupil so transferred pay semiannually, in advance, if financially able to do so in the opinion of the board of trustees, as tuition, an amount not less than the per capita expenditure from the special tax for operating the school to which the pupil is to be transferred, together with all other charges paid by patrons of such district for any special course or courses.").

Based on the foregoing, I would declare Act No. 294 unconstitutional and, as a result, reverse the order of the circuit court.

HEARN, J., concurs.